UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

VMR PRODUCTS, LLC,

          Plaintiff,

  v.

V2H APS, ET AL.,

          Defendants.

No. 2:13-cv-7719-CBM-JEM

**ORDER**

The matter before the Court is the parties' bench trial.  The Court has considered memoranda, trial briefs, witness testimony, other evidence presented and objections thereto, oral arguments of counsel, and motions for judgment per Rule 52(c).  The Court issues the following facts and conclusions herewith.  *See* Fed. R. Civ. P. 52(a).

## I.    INTRODUCTION

Plaintiff/Counter-Defendant VMR Products, LLC ("VMR") sells and markets disposable electronic cigarettes and other accessories in the United States using the mark V2. VMR alleges that Defendants/Counterclaimants V2H ApS ("V2H") and V2 Tobacco A/S ("V2 Tobacco") (collectively, the "V2 Parties") infringe upon VMR's V2 trademarks by using the V2TOBACCO mark to sell tobacco snus products in the United

States. VMR requests the Court to permanently enjoin the V2 parties from using V2TOBACCO in the United States.

Following the Court's order on partial summary judgment, issued March 18, 2016 (Dkt. No. 198), VMR has one federal trademark infringement claim remaining: V2 Parties violate Sections 32 and 43 of the Lanham Act, 15 U.S.C. § 1114, 1125(a). The V2 parties counterclaim, seeks an order cancelling VMR's V2CIGS trademark registration pursuant to 15 U.S.C. § 1064(3) and 15 U.S.C. § 1120. The matter was tried before the Court, sitting without a jury.

## II.   OBJECTIONS TO DEPOSITION DESIGNATIONS

The Court considered the parties' deposition designations and objections thereto and rules as follows:

**A.   Deposition of Jan Verleur (July 2, 2015)**

The Court **SUSTAINS** Plaintiff's objections to the deposition testimony at:

- Page 13, lines 12 through 18; and
- Page 120, line 3 through page 122, line 16.

The Court **OVERRULES** Plaintiff's remaining objections to the deposition testimony.

**B.   Deposition of Adam Kustin (July 28, 2015)**

The Court **OVERRULES** Plaintiff's objections to the deposition testimony.

**C.   Deposition of John Geoghegan (July 11, 2013)**

The Court **SUSTAINS** Defendants' objection to the deposition testimony at page 172, lines 20 through 25.

The Court **OVERRULES** Defendants' remaining objections to the deposition testimony.

**D.   Deposition of John Geoghegan (July 24, 2015)**

The Court **SUSTAINS** Defendants' objections to the deposition testimony at:

- Page 35, lines 15 through 18;
- Page 41, lines 13 through 19;

- Page 41, line 22 through page 42, line 8;

- Page 91, line 22 through page 92, line 6;

- Page 165, lines 1 through 2;

- Page 210, lines 23 through 25; and

- Page 225, line 9 through page 226, line 12.

The Court **OVERRULES** Defendants' remaining objections to the deposition testimony.

### III.   FINDINGS OF FACT

**Plaintiff VMR**

1.   Plaintiff/Counter-Defendant is VMR Products, LLC ("VMR"), a limited liability company, founded in 2010, with its principal place of business in Florida.  (Dkt. No. 272, Pre-Trial Conference Order ("PTCO") at 1:23-24, 2:3, 4:19-20; Tr. 77:3-7.)

2.   Dan Recio serves as VMR's President, (Tr. 38:21-22), Jan Verleur as VMR's Chief Executive Officer ("CEO") (Deposition of Jan Verleur, July 2, 2015 ("Verleur Depos.") at 4:8-24; Tr. 38:8-12), and Adam Kustin as VMR's Vice President of Marketing (Deposition of Adam Kustin, July 28, 2015 ("Kustin Depo.") at 4:3-10).

3.   VMR designs, manufactures, and distributes vaporizing products and accessories, including electronic cigarettes.  (PTCO 4:21; Tr. 38:2-3, 58:9-63:7; Verleur Depo. at 15:3-21; Ex. 126 at 6-14.)   Electronic cigarettes are used as alternatives to smoking traditional cigarettes.  (PTCO 4:22-23.) VMR makes dis

4.   VMR sells and markets disposable and rechargeable electronic cigarettes, and other accessories, in the United States using the mark V2.  (Tr. 52:9-53:22, 58:9-63:7; *see also* Ex. 125; Ex. 126 at 6-14.)

\\

\\

**Defendants V2 Parties**

5.     Defendants/Counterclaimants are V2H ApS ("V2H") and V2 Tobacco A/S ("V2 Tobacco") (collectively, the "V2 Parties").  (PTCO at 1:24-25, 2:3.)

6.     V2H was formed in 2006 and is a closely held limited liability company, organized under the laws of Denmark on February 28, 2011.  (PTCO 5:1-2; Tr. 332:20-24, 466:1-21, 467:16-20, 474:17-19; Exs. 31, 42, 97, 98.)   V2 Tobacco is a Danish corporation and wholly owned subsidiary of V2H, formed on February 28, 2011.  (PTCO at 5:7-8; Tr. 339:1-20; Ex. 100.)  V2H and V2 Tobacco share the same physical address and principle place of business.  (PTCO at 5:2-3, 5:9; Ex. 98.)

7.     Mark Vogel and Patrick Vogel are both directors of V2H and V2 Tobacco. (PTCO at 5:4, 5:10, Tr. 475:9-13.)

8.     Mark Vogel and Patrick Vogel are the only employees of V2H.  (Deposition of Patrick Vogel ("Vogel Depo.") at 31:12-17.)

9.     V2 Tobacco is in the business of promoting and selling snus, which is a tobacco product.  (Tr. 341:12-14, 341:17-18, 434:19-21.)

10.    V2H is a holding company that does not manufacture or sell products.  (Tr. 340:21-341:6; Geoghegan Depo. 2015 at 64:13-20.)  V2H owns a community trademark for the mark V2TOBACCO and V2 in Europe; V2H has licensed the use of the mark V2TOBACCO to V2 Tobacco and no other entities.  (Tr. 264:8-25, 268:13-25, 391:10-393:4, 393:6-394:3; 402:2-22, 403:3-404:1, 436:8-16, 489:2-490:4; Exs. 205, 221, 222, 223, 224.)

11.    The V2 Tobacco snus distributed in the United States for sale in "brick and mortar" stores does not bear the mark V2TOBACCO.  (Tr. 433:25-434:9, 435:4-436:7, 497:4-12; Geoghegan Depo. 2015 at 13:21-14:4, 64:21-25, 65:7-15, 68:1-20, 113:15-24, 131:4-15; Exs. 249, 250.)

\\
\\

**VMR's V2 Mark**

12.   VMR has used the mark V2 in association with its products since July 30, 2010. (Ex. 2 at 10-11.)

13.   VMR holds four registrations for the mark V2 with the United States Patent and Trademark Office ("USPTO"), which were registered on January 14, 2014. (Tr. 74:1-19; Ex. 2 at 10-17.) USPTO Registration No. 4,464,785 for the mark V2 is for "Disposable and reusable cartridges filled with vaporizable nicotine, for use with battery powered, rechargeable portable vaporizing units in the nature of electronic cigarettes and smokeless cigarette vaporizer pipes, in Class 1 (U.S. Cls. 1, 5, 6, 10, 26 and 46)" and "Battery-powered, rechargeable portable vaporizing units in the nature of electronic cigarettes and smokeless cigarette vaporizing pipes; battery-powered disposable portable vaporizing units in the nature of electronic cigarettes and smokeless cigarette vaporizer pipes, in Class 34 (U.S. Cls. 2, 8, 9 and 17)." (Ex. 2 at 10-11.) The three other USPTO registrations for V2, (Registration Nos. 4464784, 4464783, 4464781), are for accessories to be utilized with VMR's vaporizers and electronic cigarettes. (*Id.* at 10-17.) These include "vaporizable, chemical flavoring in liquid form," "carrying cases, bags and handbag-like cases," and "portable chargers." (*Id.*)

14.   The mark V2 stands for "version 2," signifying that VMR's electronic cigarettes are the "version 2" to traditional tobacco cigarettes. (PTCO at 4:22-23; Tr. 40:1-8.) The mark V2 appears on VMR's user manuals, which contain information regarding VMR's V2 electronic cigarette and other accessories. (Tr. 58:23-19, 58:23-62:22; *see also* Ex. 126 at 5-8, 11, 14.)

15.   VMR's customers and other businesses associate the V2 mark with VMR's products, including VMR's electronic cigarettes and vaporizers. (Tr. 54:2-16, 87:16-88:5.)

\\

**VMR's V2 Electronic Cigarettes and Associated Products**

16.     VMR's electronic cigarettes are electronically-powered handheld devices that are to be used with flavor cartridges that contain an e-liquid, which, when heated by the electronic cigarette, turns into a vapor that is inhaled by the user through the mouth and into the lungs.  (Tr. 44:21-23, 45:3-5; *see also* Verleur Depo. at 14:24-15:2.)  VMR's e-liquids contain nicotine, which is delivered to the user when the vapor is inhaled.  (PTCO at 4:24-25; Tr. 44:3-21, 45:20-46:4, 48:5-10.)

17.     VMR markets a variety of flavor cartridges under the mark V2, some of which are designed to appeal to tobacco users by using flavor profiles consistent with other tobacco products.  (Tr. 47:19-22, 48:15-24; Ex. 124.)   These flavor cartridges, which include V2 Red, V2 Sahara, V2 Black, and V2 Congress, contain tobacco extract.  (Tr. 48:25-49:24, 201:21-202:4; Verleur Depo. at 33:11-14.)

18.     VMR has been selling products that contain tobacco extract since the company's inception in 2010.  (Verleur Depo. at 17-20.)

19.     VMR tests its products before they are sold to consumers to confirm that they are free of a variety of harmful chemicals, which are found in traditional tobacco, such as heavy metals, tobacco specific nitrosamines ("TSNAs"), and diethylene glycol.  (Tr. 106:17-107:7.)   There are no detectable levels of TSNAs in VMR's electronic cigarettes marketed as V2.   (Tr. 166:14-17, 224:12-18.)  VMR will not sell products to consumers if they detect that they contain TSNAs.  (Tr. 107:8-11.)

20.     The nicotine in VMR's e-liquids is pharmaceutical grade nicotine extracted from tobacco plants.  (Tr. 107:16-23.)  This type of nicotine is also found in other nicotine delivery systems, including nicotine patches, gums, and lozenges.  (Tr. 107:8-108:5.)   No other constituents are contained in the

nicotine used by VMR by virtue of the extraction process used by VMR.  (Tr. 108:6-9.)

21. The mark "V2" and the word "tobacco" appear together on some of VMR's products, including on the e-liquid marketed by VMR called "V2 Red Tobacco."  (Tr. 66:24-67:8, 202:9-21, 284:5-10; Ex. 121 at 2, 4; Ex. 128 at 3.)  VMR sells this product under a name that includes the word "tobacco" to indicate that it is a flavor that would appeal to a traditional tobacco consumer.  (Tr. 67:9-68:6.)

22. VMR also markets V2 "vape pens," which are more powerful versions of electronic cigarettes.  (Tr. 68:15-25; Ex. 128 at 16.)  VMR's vape pens, including those in the V2 Pro series (Series 3 and Series 7), are marketed as being compatible with loose leaf products, including tobacco.  (Tr. 69:10-70:8; Verleur Depo. at 15:23-16:10, 17:10-13, 203:24-205:24, 207:13-22, 210:23-213:11; Ex. 128 at 16-17.)

**V2H's V2TOBACCO Mark**

23. The "V2" in the company name V2 Tobacco stands for Vogel, which is the last name of the two brothers who formed the company, and the "2" signifies that there are two brothers.  (Tr. 475:9-13.)

**V2 Tobacco's Snus Product**

24. Snus is a smokeless, loose leaf tobacco product that contains nicotine, and can be used as an alternative to smoking cigarettes.  (Tr. 103:23, 341:19-342:2; Deposition of John Geoghegan, July 11, 2013 ("Geoghegan Depo. 2013") at 29:2-6.)  The principal reason consumers use snus is to ingest nicotine.  (Tr. 341:23-25.)

25. Snus is used by placing it inside the user's mouth, behind the upper lip.  (Tr. 342:14-18.)  The saliva produced in the mouth upon the placement of the snus may be swallowed instead of spit out.  (Tr. 103:24-104:19, 166:18-19, 342:21-

25.) VMR does not sell tobacco products that are used in a similar manner. (Recio Depo. at 21:16-24, 177:8-15.)

26. Snus contains TSNAs, which are carcinogens found in tobacco. (Tr. 348:3-7.) Snus was banned in the European Union, in part because tobacco for oral use contains large quantities of carcinogenic substances. (Tr. 347:5-10; *see also* Ex. 115.)

27. V2 Tobacco tests its products for TSNAs, nickel, and other substances. (Tr. 479:14-24.)

28. V2 Tobacco's products do not include battery-powered rechargeable portable vaporizing units, smokeless vaporizing pipes, chemical flavorings, e-liquids, vaporizable chemical flavoring e-liquids, carrying cases, bags, handbags, batteries, or chargers. (Tr. 476:19-477:20.) V2 Tobacco's products are not complimentary to electronic cigarettes or their accessories. (Tr. 478:1-13.)

**VMR's Use of Websites**

29. VMR has used the website domain names v2cigs.com and v2.com. (Tr. 41:21-22; 53:23-54:16.) The v2cigs.com website went live in April 2010. (Tr. 41:23-24.)

30. Consumers in the United States can access VMR's websites, which market and sell VMR's products bearing the V2 mark. (Tr. 41:25-42:16, 53:23-54:16, 65:22-66:21, 89:18-21, 215:5-15; Ex. 128; Ex. 213 at 4.)

**V2 Parties' Use of Websites**

31. V2H owns and is the registrant of the website www.v2tobacco.com; V2 Tobacco operates and maintains the website. (Tr. 126:13-18, 348:8-10, 348:15-16; *see also* Exs. 31, 314.) The website bears the mark V2TOBACCO, with the "V2" portion of the mark written in bright orange. (Tr. 127:13-128:3.) It also provides links to other webpages, including those for online shops, wholesalers, store locators, and catalogues. (Tr. 128:21-129:5, 357:3-358:1; Ex. 119.)

32.    The www.v2tobacco.com website, which was first registered in 2006, can be accessed by people throughout the world, including consumers in the United States.  (Tr. 286:7-18, 348:11-14, 466:1-21, 467:16-20, 468:14-15; Exs. 8, 31, 42, 97.)

33.    Consumers cannot purchase V2 Tobacco's products directly from the website www.v2tobacco.com.  (Tr. 84:15-19, 467:8-11.)  Instead, a consumer in the United States can click on the link for "online shops" on the www.v2tobacco.com website and be redirected to third party online shops, where the consumer can then purchase V2 Tobacco snus over the Internet. (Tr. 130:13-131:21, 357:9-358:1, 358:24-359:4, 359:10-12, 360:8-19, 376:1-3, 436:17-18.)  V2 Tobacco snus that is purchased from third party online shops bears the mark V2TOBACCO on its packaging.  (Tr. 437:3-19, 501:24-502:1.)

34.    At one point, a "Store Locator" link appeared on the website www.v2tobacco.com, and by clicking on that link, a consumer would be redirected to a webpage listing stores in the United States selling V2 Tobacco products, as well as a map demonstrating the stores' locations.  (Tr. 138:17-143:25; *see also* Exs. 58, 103; Geoghegan Depo. 2015 at 211:3-15.)

35.    The Store Locator link was removed from this webpage over a year ago, but currently appears on the website snus.mobi, which is also registered to V2H and administered by V2 Tobacco.  (Tr. 384:1-17, 385:2-388:2.)

36.    The "Wholesale" link on www.v2tobacco.com redirects users to the wholesale page of the website, which provides information regarding V2 Tobacco's distributors, including its distributor of V2 Tobacco products in the United States.  (Tr. 133:5-135:12, 364:2-365:17; *see also* Exs. 10, 119.)

37.    The www.v2tobacco.com website also provides a link to download V2 Tobacco's yearly catalogue, which describes the products marketed and sold by V2 Tobacco.  (Tr. 135:13-136:12; Exs. 6, 10.)  The catalogue bears the mark V2TOBACCO and the corporate names V2 Tobacco and V2

9

Distribution.  (Tr. 136:13-137:17; Ex. 6.)  V2 Tobacco's 2013 catalogue made the following statement regarding V2 Tobacco snus: "All products are pasteurized, with low levels of TSNA."  (Tr. 137:18-22; Ex. 6.)

38.   In 2013, the www.v2tobacco.com website made the statement "The tobacco used in the production of snus is selected on the basis of a low level of nitrosamines (TSNA)."  (Ex. 8; Tr. 146:12-148:7.)

39.   V2 Tobacco currently makes statements regarding the level of TSNAs in V2 Tobacco snus on the webpage www.snus-standard.com, which bears the mark V2TOBACCO and is accessible through the website www.v2tobacco.com by clicking on a link titled "Snus products."  (Tr. 144:1-145:24, 456:18-459:6; Geoghegan Depo. 2015 at 222:20-223:14, 224:3-7; Exs. 8, 31.)  Specifically, the www.snus-standard.com webpage provides: "The tobacco used in the production of snus is selected on the basis of low level of nitrosamines, TSNA.  Nitrosamines are found in snus naturally, but the amount can vary depending on how the tobacco is cultivated and treated by the producer."  (Ex. 8 at 2.)

**VMR's Target Audience and Association with Tobacco**

40.   VMR's target audience is electronic cigarette smokers and users of traditional tobacco products who are looking for an alternative to tobacco.  (Tr. 91:2-5; Verleur Depo. at 34:2-6.)   VMR's customers exhibit a high degree of sophistication when it comes to purchasing VMR's products, and take time to research VMR's products before purchasing them.  (Tr. 97:16-100:13.)

41.   VMR advertises on www.v2.com, and in print media and other targeted publications.  (Tr. 101:18-102:2.)

42.   VMR's most significant wholesaler is the National Tobacco Company.  (Tr. 89:22-90:5.)  The National Tobacco Company currently distributes and sells V2 marked electronic cigarettes in the United States, making up

approximately 35 to 40 percent of VMR's sales.  (Tr. 94:10-12, 213:24-214:8, 216:20-22, 247:12-14.)

43.   The National Tobacco Company is a company that has substantial experience distributing tobacco products to retail outlets where tobacco products are sold, and where VMR believes its products belong because they are alternatives to tobacco products.  (Tr. 90:11-14.)   VMR pursued the business relationship with the National Tobacco Company because it was important to VMR that its products be distributed alongside tobacco products so consumers could make a decision to go with a traditional tobacco product or an alternative product, such as VMR's products. (Tr. 90:14-17, 91:11-19.)

44.   The National Tobacco Company promotes V2 products at conventions, trade shows, industry shows, in print advertisements, and on the National Tobacco Company website.   (Tr. 102:4-14.)   The National Tobacco Company also markets VMR's products in stores by offering sampling and couponing, providing in-store or point-of-sale signage in the stores.  (Tr. 102:14-20.)

45.   VMR has made its partnership with the National Tobacco Company public. (Tr. 91:11-19; Ex. 120.)

**V2 Tobacco's Target Audience**

46.   V2 Tobacco's target audience is adult tobacco users.   (Deposition of John Geoghegan, July 24, 2015 ("Geoghegan Depo. 2015") at 201:3-19.)

47.   The United States is one of V2 Tobacco's smallest markets for sales of snus; V2 Tobacco sold approximately $7,000 in product in the United States over a recent one-year period.  (Tr. 473:11-474:3.)

**Possible Confusion Between the Parties' Products**

48.   Both Plaintiff VMR's V2 electronic cigarettes and Defendant V2 Tobacco's snus are sold at convenience stores and gas stations, along with tobacco products.  (Tr. 88:13-89:17, 95:11-17, 376:4-12.)  However, although snus and electronic cigarettes sold in the same store would likely both be placed in the

11

1   nicotine section, they would not necessarily be placed next to each other.

2   (Geoghegan Depo. 2015 at 205:5-206:24, 207:10-23.)

3   49.   VMR's and V2 Tobacco's products are not sold on the same websites, and

4   there is no persuasive evidence that they are sold in the same stores.  (*See* Tr.

5   288:1-8, 290:24-291:16.) VMR's President Dan Recio testified at trial that he

6   believed there was one store chain that sold both products, but at the time of

7   his deposition on June 26, 2016, he testified that he was not aware of any such

8   store. (Tr. 288:1-8; Recio Depo. at 66:21-67:6.) The Court gives no weight to

9   this testimony.

10   50.   A disposable electronic cigarette costs about $9.00; a can of snus retails for

11   about $4.25.  (Geoghegan Depo. 2015 at 21.)

12   51.   An entity offering a discount for V2 products on its website appears to have

13   confused V2 Tobacco products with VMR's V2 products.   (Tr. 159:13-

14   160:20; Ex. 84.) The website lists several of VMR products in addition to "V2

15   Tobacco disposables." (*Id.*) Neither Plaintiff VMR nor Defendant V2 Tobacco

16   makes V2 Tobacco disposables. (Tr. 160:14-18.)

17   52.   A website reviewing several electronic cigarette e-liquids from various

18   companies appears to have confused V2 Tobacco products with VMR's V2 E-

19   Cigs, V2 Cigs, and V2 Platinum E-Liquids, V2 E-liquid.  (Tr. 162:7-163:16;

20   Ex. 87.)  The website references a "V2 Tobacco e-liquid bundle," which is a

21   VMR product. (Tr. 163:1-9; Ex. 87.)

22   53.   There was no evidence offered at trial of consumer confusion between

23   Plaintiff's V2 marked electronic cigarettes and Defendant's V2 Tobacco snus,

24   including snus bearing the mark V2TOBACCO.

25   **Expansion of Product Lines**

26   54.   There was no evidence offered at trial that Plaintiff VMR has any intention of

27   expanding into the smokeless tobacco industry.  (Tr. 291:17-19.)   Plaintiff

28

VMR has never offered for sale in the United States any smokeless tobacco or snus products.  (Verleur Depo. at 25:5-10.)

55.   There was no evidence offered at trial that Defendant V2H has any intention of expanding into the electronic cigarettes industry.  (Tr. 292:1-293:17.)

**VMR's Trademark Application filed with the USPTO for the Mark V2CIGS**

56.   V2H owns the United States trademark THUNDER V2, Registration No. 3788273, for smokeless tobacco and has authorized V2 Tobacco to use THUNDER V2 as a trademark in the United States.  (Ex. 226; Tr. 481:8-20.) The THUNDER V2 mark has been in use in United States commerce since October 31, 2009.  (Ex. 226; Tr. 481:14-20.)

57.   The USPTO registered VMR's mark V2CIGS in January 2014.   (Ex. 2.) During the application process, however, the USPTO examining attorney issued an initial office action refusing to register the mark pursuant to 15 U.S.C. § 1052(2)(d), citing a likelihood of confusion between the mark V2CIGS and V2H's mark THUNDER V2, which had been registered previously.  (Ex. 203.)

58.   VMR filed a response to the office action, stating that the goods for V2CIGS do not include smokeless tobacco, and further represented to the USPTO that (1) there is absolutely no tobacco present in VMR's products; (2) VMR's goods do not include tobacco products and exclude V2H's goods, smokeless tobacco; (3) V2H's goods are wholly dissimilar from VMR's goods, and therefore confusion is unlikely; (4) the marks only share the term V2, which does not render confusion likely because the marks must be considered in their entirety, and thus (6) the two marks at issue look and sound completely different so as to avoid a likelihood of confusion; (7) there is nothing to suggest that VMR's tobacco-less products would cross into V2H's trade channels.  (Ex. 203; Tr. 244:15-246:11, 250:10-252:21.)

59.     In his deposition, Mr. Recio testified that VMR's e-liquids that do not contain tobacco extract are tobacco-free.  (Tr. 206:12-207:5.)  At trial, Mr. Recio testified that he did not agree that VMR's e-liquids that contain tobacco extract also contain tobacco.  (Tr. 206:12-14.)  He stood by his statement that there is absolutely no tobacco present in VMR's products.  (Tr. 246:9-11.)

60.     Mr. Recio testified at trial that he had no way of verifying whether VMR's e-liquids contain nitrosamines.  (Tr. 222:23-25.)  He stated that the standardized testing protocols that VMR applies may fail to detect trace levels of nitrosamines in VMR's product.  (Tr. 223:22-224:4.)

61.     VMR offers no evidence at trial that VMR's e-liquids contain TSNAs at detectable levels.  (Tr. 224:12-18.)

62.     VMR does not consider tobacco extract to be a tobacco product, although several of VMR's products contain tobacco extract.  (Tr. 246:12-247:1.)

63.     VMR did not perform tests on its e-liquids in 2011 to determine whether they contain tobacco when it represented to the USPTO that there was no tobacco present in its products because it did not have the financial resources to do so.  (Tr. 247:15-248:20.)  Instead, VMR relied on information given to it by their manufacturer, which stated that there was no tobacco in the product.  (Tr. 248:21-249:8.)

64.     VMR did not have the financial resources to perform the tests in 2011; it began testing its product later when its financial resources allowed.  (Tr. 249:13-22.)

65.     VMR first learned that there was tobacco extract in some of its e-liquids around 2013, when it employed its own chemical engineering teams. (Verleur Depo. at 113:9-21.)

**V2H's Application for Registration of the V2TOBACCO Mark with the USPTO**

66.     V2H applied for a United States trademark registration for the mark V2TOBACCO on August 17, 2012, Serial Number 85706094.  (PTCO ¶ 7;

Ex. 3, 227.)  In the application, V2H did not submit evidence of use of the mark V2TOBACCO in the United States, relying instead on its foreign registration of the mark as a priority date.  (Tr. 419:4-10, 421:4-13.)  V2H represented to the USPTO that there was no likelihood of confusion between the V2TOBACCO mark and VMR's marks.

67.     The USPTO determined in 2013 that there was no likelihood of confusion between any existing trademark registration or pending trademark application and V2TOBACCO, which would include VMR's marks V2CIGS and V2. (Tr. 487: 17-20; Ex. 268.)

**VMR's Request for a License to Use the Mark V2 in the European Union**

68.     Plaintiff VMR first learned about Defendant V2H and its trademark for V2 in Europe in 2012 when its counsel ran a trademark search for Europe for any marks with "V2."  (Tr. 110:24-111:11, 268:22-269:7.)  As a result, on June 28, 2012, VMR's counsel sent an email to V2 Tobacco's counsel requesting a license from V2H to use the mark V2 in the European Union.  (Tr. 111:12-16; Ex. 246.)  After a series of email correspondence over August and September 2012, counsel for V2 Tobacco indicated that it did not wish to license the mark V2 to VMR for use in Europe.  (Tr. 113:5-7; Ex. 245.)

69.     VMR began using the marks V2 and V2CIGS in the European Union before VMR contacted counsel for the V2 Defendants to discuss a possible trademark license.  (Ex. 205 at 1; Tr. 271:5-8.)

**The Florida Action**

70.     On December 17, 2012, VMR filed a lawsuit against V2H in the U.S. District Court for the Southern District of Florida, *VMR Products LLC v. V2H ApS*, Case No. 1:12-cv-24431-UU (the "Florida Action"), alleging no likelihood of confusion between the V2CIGS and V2TOBACCO marks.  (PTCO ¶ 20; Tr. 118:18-20; Ex. 215.)  The complaint was amended on January 11, 2013.  (Ex. 216.)

71.     In the Florida Action, VMR sought declaratory relief that there was no likelihood of confusion between the V2CIGS and V2TOBACCO marks.  (Ex. 215; Ex. 216.)

## IV.     CONCLUSIONS OF LAW

1.      The facts, insofar as they may be conclusions of law, are hereby incorporated by reference.

**Effect of Other Legal Proceedings**

2.      "Judicial admissions are formal admissions in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact."  *American Title Ins. Co. v. Lacelaw Corp*., 861 F.2d 224, 226 (9th Cir. 1988).   "A statement in a complaint … is a judicial admission."  *Id*.

3.      On summary judgment, the Court found that VMR made the following judicial admission in the Florida Action, which is relevant to the remaining claim for infringement: (1) "V2H uses the V2TOBACCO mark only in connection with tobacco products, and in particular, smokeless tobacco snus"; (2) "Upon information and belief, V2H does not use the V2TOBACCO mark in connection with the sale of e-cigs or any tobacco-free smoking abatement program"; and (3) VMR's products and V2H's products are "different goods." (*See* Dkt. No. 198:27-199:6.)

4.      Where the USPTO has not decided the same issue as that before the district court, there is no reason why any deference to the USPTO is warranted.  *B & B Hardware, Inc. v. Hargis Industries, Inc*., 135 S. Ct. 1293, 1308 (2015). However, TTAB decisions regarding trademarks, although not binding, may be given great weight in district court proceedings.  *Lahoti v. Vericheck, Inc*., 636 F.3d 501, 506 (9th Cir. 2011).   Here, the USPTO has never definitively determined whether there exists a likelihood of confusion between the marks V2TOBACCO and V2, and thus whether one infringes on the other.   The

TTAB proceeding regarding whether the V2TOBACCO mark should be registered by the USPTO remains pending.

5. Courts have found probative a plaintiff's prior statements to the USPTO in cases analyzing infringement under the Lanham Act. *Hansen Beverage Co. v. Cytosport, Inc*., No. cv-09-0031, 2009 WL 5104260, *8 (C.D. Cal. Nov. 4, 2009) (citing *Freedom Card, Inc. v. JP Morgan Chase & Co*., 432 F.3d 463, 468 (3d Cir. 2005); *Instant Media, Inc. v. Microsoft Corp*., 2007 U.S. Dist. LEXIS 61443 (N.D. Cal. 2007); *Petro Stopping Centers, L.P. v. James River Petroleum, Inc*., 130 F.3d 88, 94 (4th Cir. 1997); *Classic Foods Int'l Corp. v. Kettle Foods, Inc*., 2006 WL 518777497, *11 (C.D. Cal. Mar. 2, 2006)). Both parties have represented to the USPTO that marks sharing the overlapping term "V2" are dissimilar, and that electronic cigarettes and smokeless tobacco are different goods. (Findings of Fact 58, 66.)

6. Trademarks are territorial and exist in individual countries solely according to that country's statutory scheme. *Person's Co. v. Christman*, 900 F.2d 1565, 1568-69 (Fed. Cir. 1990). "When trademark rights within the United States are being litigated in an American court, the decisions of foreign courts concerning the respective trademark rights of the parties are irrelevant and inadmissible." *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 599 (5th Cir. 1985) (citing *Vanity Fair Mills v. T. Eaton Co.*, 234 F.2d 633, 639 (2d Cir. 1956)). Therefore, the Court does not consider the evidence offered at trial regarding decisions reached by European courts.

**Family Smoking Prevention and Tobacco Control Act**

7. No person may introduce or deliver for introduction into interstate commerce any modified risk tobacco product unless it receives an order from the FDA allowing it to do so. 21 U.S.C. § 387k.

8.     The term "modified risk tobacco product" means any tobacco product that is sold or distributed for use to reduce harm or the risk of tobacco-related disease associated with commercially marketed tobacco products.  21 U.S.C. § 387k.

9.     The Family Smoking Prevention and Tobacco Control Act prohibits parties from doing the following to ensure that products are not labeled as modified risk tobacco products without permission: (1) labeling or advertising which represents explicitly that the tobacco product presents a lower risk of tobacco-related disease or is less harmful than one or more other commercially marketed tobacco products; the tobacco product or its smoke contains a reduced level of substance or presents a reduced exposure to a substance; or the tobacco product or its smoke does not contain or is free of a substance; (2) labeling or advertising that uses the descriptors "light," "mild," or "low" or similar descriptors; or (3) other actions directed to consumers through the media or otherwise, other than by means of the tobacco products label, labeling, or advertising, after June 22, 2009, respecting the product that would be reasonably expected to result in consumers believing that the tobacco product or its smoke may present a lower risk of disease or is less harmful than one or more commercially marketed tobacco products, or presents a reduced exposure to, or does not contain or is free of, a substance or substances. *Id.*

10.    Defendants' website and catalogues contained statements that violate the Family Smoking Prevention and Tobacco Control Act.  (Findings of Fact 37, 38, 39.)

**Trademark Infringement:**

11.    For a defendant to be found liable for trademark infringement under both Sections 32 and 43 of the Lanham Act, a plaintiff must show that: (1) plaintiff's mark is valid and protectable; (2) plaintiff owns the mark as a trademark; and (3) defendant's mark is likely to confuse customers as to the

source of the products.  *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1046-47 (9th Cir. 1999); *Phillip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1072 (C.D. Cal. 2004).  The plaintiff must also demonstrate that the mark is used in United States commerce.  *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1203-04 (9th Cir. 2012).

**Validity and Ownership**

12.    Trademarks can be contestable or incontestable.  *See* 15 U.S.C. § 1115.

13.    Where a trademark has been registered with the USPTO for less than five years, the mark is considered contestable, such that its registration provides only *prima facie* evidence of the validity and ownership of the mark and of the registrant's exclusive right to use the registered mark in commerce on, or in connection with, the goods or services specified in the registration.  15 U.S.C. § 1115.

14.    VMR's mark V2 is a contestable mark.  (*See* Findings of Fact 13.)

15.    The registration of a contestable mark does not preclude another party from proving any legal or equitable defense or defect to the mark that might have been asserted if such mark had not been registered.  15 U.S.C. § 1115(a).

16.    Where a contestable mark is challenged, the standard test of ownership is priority of use of the mark in commerce.  *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219-20 (9th Cir. 1996).  The party with the later filing date has the burden of proving that it possesses the prior right to the mark by a preponderance of the evidence.  *Vuitton et Fils S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769, 775 (9th Cir. 1981); *SCM Corp. v. Langis Foods Ltd.*, 539 F.2d 196, 199 (D.C. Cir. 1976).

17.    However, a mark's use in commerce "only creates [a] trademark right when the use is lawful."  *CreAgri, Inc. v. USANA Health Sci., Inc.*, 474 F.3d 626, 630 (9th Cir. 2007) (citations omitted).  Accordingly, only lawful use of a mark in commerce can give rise to trademark priority.  *Id.* (holding that a

19

party's use of a mark on misbranded labels, the use of which violated statutes and FDA regulations, was not use in commerce that could establish priority in the mark).   Additionally, unlawful conduct of a party does not preclude trademark protection if the conduct is immaterial or "collateral," such that there is an insufficient nexus between the unlawful behavior and the use of the mark in commerce.  *Southern California Darts Ass'n v. Zaffina*, 762 F.3d 921, 931 (9th Cir. 2014) (unlawful conduct of a party does not preclude trademark protection if the conduct is immaterial or "collateral," such).

18.   Although the www.v2tobacco.com website has been in use since 2006 (Findings of Fact 32), statements made by the V2 Parties on the website violated the Family Smoking Prevention and Tobacco Control Act at least as early as 2013 (Findings of Fact 37, 38, 39; Conclusions of Law 10).  There is a sufficient nexus between this unlawful conduct and use of the V2TOBACCO mark to market V2 Tobacco's snus to consumers.   *See CreAgri, Inc.*, 474 F.3d at 630.  Therefore, the V2TOBACCO mark was not lawfully used in commerce, and the V2 Parties cannot benefit from its priority use.

19.   VMR owns the mark V2, which is valid and protectable.

**Use in Commerce**

20.   The mark V2TOBACCO is used in United States commerce.

21.   Use in commerce means the *bona fide* use of a mark in the ordinary course of trade.  15 U.S.C. § 1127.  A mark shall be deemed to be in use in commerce on goods when (1) it is placed in any manner on the goods, or their containers, displays, tags, or labels; and (2) the goods are sold or transported in commerce.  *Id.*

22.   A defendant's advertising and promotion of goods on a website, where the defendant provides hyperlinks on the website to different websites where the defendant's goods may be purchased satisfies the "use in commerce"

requirement. *Nissan Motor Co. v. Nissan Comput. Corp.*, 378 F.3d 1002, 1019 (9th Cir. 2004).

23. Although the V2 Tobacco snus distributed and sold at stores in the United States does not bear the mark V2TOBACCO, the mark V2TOBACCO is nonetheless used in United States commerce because it appears on the V2 Parties' websites, which provide hyperlinks to third party online shops where consumers in the United States can purchase Defendants' snus that bears the mark V2TOBACCO.

**Likelihood of Confusion**

24. Courts in the Ninth Circuit weigh the following eight factors to determine whether there is a likelihood of confusion: (1) the strength of the mark; (2) the proximity or relatedness of the goods; (3) the similarity of the marks; (4) evidence of actual confusion; (5) the marketing channels used; (6) the type of goods and degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion of product lines. *Coach, Inc. v. Asia Pac. Trading Co., Inc*., 676 F. Supp. 2d 914, 919 (C.D. Cal. 2009) (citing *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979)).

**Factor 1 – Strength of the Mark**

25. The scope of the trademark protection given to marks depends on the strength of the mark. *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1141 (9th Cir. 2002).

26. A mark's strength is based on both (1) its conceptual strength, or distinctiveness; and (2) its commercial strength, which is based on actual marketplace recognition. *GoTo.com v. Walt Disney Co*., 202 F.3d 1199, 1207 (9th Cir. 2000); *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1032-33 (9th Cir. 2010).

27. From weakest to strongest, marks are classified as (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful, based on increasing distinctiveness. *Two Pesos, Inc. v. Taco Cabana, Inc*., 505 U.S. 763, 768 (1992); *GoTo.com*, 202 F.3d at 1207.

28. Fanciful, arbitrary, and suggestive marks are inherently distinctive and receive a broad scope of judicial protection without proof of secondary meaning. *Two Pesos*, 505 U.S. at 768.

29. In particular, to be considered suggestive, a mark must require consumers to use their imaginations to understand the mark's significance. *Fortune Dynamic, Inc*., 618 F.3d at 1033 (quoting *Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1114 (9th Cir. 2010)).

30. Descriptive marks, on the other hand, describe the qualities or characteristics of the product they represent, and are therefore not protected by trademark unless they acquire secondary meaning in the marketplace. *Id*.; *see also Entrepreneur Media*, 279 F.3d at 1141-42; *Quicksilver, Inc. v. Kymsta Corp*., 466 F.3d 749, 760 (9th Cir. 2006).

31. Plaintiff's mark, V2, stands for "version 2" and is thus descriptive of a second version of cigarette.  (Findings of Fact 14.)  However, because VMR's customers and business contacts associate the V2 mark with Plaintiff's products (Findings of Fact 15), the mark has acquired secondary meaning and is thus protectable.

32. The first factor weighs in favor of VMR.

**Factor 2 – Proximity or Relatedness of the Goods**

33. "Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods." *Brookfield*, 174 F.3d at 1055.

34. This factor is measured by whether the products are: (1) complementary; (2) sold to the same class of purchasers; or (3) similar in use and function. *Sleekcraft*, 599 F.2d at 350.

35.     VMR is estopped from arguing that the parties' goods are similar because it previously made a judicial admission in the complaint filed in the Florida Action that the VMR's electronic cigarettes and V2 Tobacco's snus are "different." (*See* Conclusions of Law 3.)

36.     Neither V2 Tobacco nor V2H manufacture or sell the accessories manufactured and sold by VMR for electronic cigarettes. (Findings of Fact 28.) VMR does not manufacture or sell products similar to chewing tobacco or snus. (Findings of Fact 25.)

37.     Moreover, although both products deliver nicotine to users, the products themselves are not used in a similar manner. (*Compare* Findings of Fact 16 with Findings of Fact 25.)

38.     The second factor weighs in favor of the V2 Parties, because the goods are not related.

**Factor 3 – Similarity of the Marks**

39.     To determine whether marks are similar, courts (1) consider the marks in their entirety and as they appear in the marketplace; (2) consider the appearance, sound, and meaning of the marks; and (3) weigh similarities more heavily than differences. *GoTo.com*, 202 F.3d at 1206. The greater the similarity between the two marks at issue, the greater the likelihood of confusion. *Id.*

40.     Under the "anti-dissection rule," the likelihood of confusion between two marks is determined by viewing the trademark as a whole, as it appears in the marketplace, and not by focusing on the component parts. *Official Airline Guides v. Goss*, 6 F.3d 1385, 1389 (9th Cir. 1993).

41.     The only similarity between the V2 and V2TOBACCO marks is the prefix V2. Viewing the trademarks as they appear in the marketplace, the Court concludes that the marks are not similar.

42.     The third factor weighs in favor of the V2 Parties.

\\

**Factor 4 – Evidence of Actual Confusion**

43.     Evidence of actual confusion between the marks on the part of an appreciable portion of the actual consuming public constitutes strong support for a likelihood of confusion finding.   *Rearden*, 683 F.3d at 1210.   However, because it is difficult to gather such evidence, this factor is weighed heavily only when there is evidence of past confusion or when the particular circumstances indicate such evidence should have been available.  *Sleekcraft*, 599 F.2d at 353.

44.     Evidence of actual confusion is not required to establish likelihood of confusion.  *Am. Int'l Grp., Inc. v. Am. Int'l Bank*, 926 F.2d 829, 832 (9th Cir. 1991).

54.     There is no evidence in the record of actual consumer confusion between the V2 and the V2TOBACCO marks and products.  (*See* Findings of Fact 53.)

55.     The fourth factor weighs in favor of the V2 Parties.

**Factor 5 – Marketing Channels Used**

56.     Products sold in convergent marketing channels are more likely to be confused when represented by similar marks.  *Sleekcraft*, 599 F.2d at 353.

57.     The Court gives this factor greater weight when the products at issue are sold in unique or "niche marketplaces" as opposed to through "ubiquitous marketing channel[s]."  *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir. 2011).

58.     VMR's V2 electronic cigarettes and V2 Tobacco's snus bearing the mark V2TOBACCO are both sold over the Internet (Findings of Fact 30, 33), which is not a niche marketplace.   *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004); *Network Automation, Inc.*, 638 F.3d at 1151.  Snus bearing the mark V2TOBACCO is not sold in stores in the United States, and there is no evidence in the record that either VMR's V2

electronic cigarettes are sold in stores in Europe, or that sales of snus bearing the mark V2TOBACCO at stores in Europe affects United States commerce.

59.  The fifth factor weighs in favor of the V2 Parties.

**Factor 6 – Type of Goods and Degree of Care Exercised by Purchaser**

60.  The sixth factor focuses on the relative sophistication of, and the degree of care likely to be exercised by consumers.  *Fortune Dynamic*, 618 F.3d at 1038.

61.  Buyers that have expertise in the field, and consumers who purchase expensive goods, can be expected to exercise greater care in their purchasing decisions.  *Network Automation, Inc.*, 638 F.3d at 1152.

62.  V2 Parties' tobacco products may only be purchased by adults with identification and are legally required to be maintained by retailers under lock and key.

63.  VMR's customers exhibit a high degree of sophistication when it comes to purchasing VMR's products, and take time to research VMR's products before purchasing them.  (*See* Findings of Fact 40.)

64.  The sixth factor weighs in favor of VMR.

**Factor 7 – Defendants' Intent in Selecting the Mark**

65.  "An inference of confusion" is appropriate where a defendant adopts a mark with the intent to deceive the public or benefit from the reputation of another's trademark.  *Brookfield*, 174 F.3d at 1059.

66.  This factor favors the plaintiff where the alleged infringer adopted its mark "with knowledge, actual or constructive, that it was another's trademark."  *Id.* (citing *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1394 (9th Cir. 1993); *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 157 (9th Cir. 1963)).

67.  The V2 Parties were using the V2TOBACCO mark at least as early as 2006, at least three years before VMR began using the V2 mark in June 2010 and at

least seven years before the V2 mark was registered with the USPTO in 2014. (Findings of Fact 32, 13.)  There is no evidence before the court from which the court could infer that the V2 Parties adopted the V2TOBACCO mark in Europe with knowledge that it was another's trademark.

68.    The seventh factor weighs in favor of the V2 Parties, because there is no evidence that the V2 Parties adopted a mark with knowledge that it was another's trademark.

**Factor 8 – Likelihood of Expansion of Product Lines**

69.    The strong possibility that a party's product will expand into another's competing market weighs in favor of a finding of infringement.  *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1293 (9th Cir. 1992).

70.    There is no evidence that the parties will expand into each other's competing markets.  In fact, the parties' officers offer evidence that they do not intend to do so.  (Findings of Fact 54, 55.)

71.    The eighth factor weighs in favor of the V2 Parties.

**Weighing the Factors**

72.    On light of the findings of fact and conclusions of law set forth above, on balance, the Court concludes that there is no likelihood of confusion between the V2 and the V2TOBACCO marks.

**Injunctive Relief**

73.    A plaintiff seeking injunctive relief under the Lanham Act for trademark infringement must demonstrate (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982)); *see also Herb Reed Enter., LLC v.*

*Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013) (refusing to presume that irreparable harm follows from a finding of trademark infringement).

74. Even if the Court were to conclude that there exists a likelihood of confusion between the V2 and the V2TOBACCO marks, VMR would not be entitled to the injunctive relief it seeks because they provide no evidence that it has suffered an irreparable injury. *Flexible Lifeline Sys. v. Precision Lift, Inc.*, 654 F.3d 989, 998 (9th Cir. 2011); *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1137-38 (9th Cir. 2006).

75. Cursory, speculative, and conclusory allegations of irreparable harm are insufficient. *Herb*, 736 F.3d at 1250; *San Miguel Pure Foods Co., Inc. v. Ramar Intern. Corp.*, 625 Fed. Appx. 322, 327 (9th Cir. 2015) (citing *Solidus Networks, Inc. v. Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007)). A district court may not assume irreparable harm merely upon a showing of infringement or likelihood of confusion. *Herb Reed Enter., LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249-50 (9th Cir. 2013).

76. VMR offers evidence that it could potentially be harmed by being associated with tobacco products. (Verleur Depo. At 101:25-102:16.) Such evidence is insufficient to warrant an order of injunctive relief.

**Corporate Separateness Between Defendants**

77. VMR maintains that there is no corporate separateness between the V2 Parties, and that the corporate form is being abused and/or used for an inequitable purpose, such that an inequitable result would follow if the corporate veil is not pierced under the alter ego doctrine and/or single enterprise rule. (PTCO at 6:19-23.)

78. The elements for the application of the alter ego doctrine are: (1) that there is such a unity of ownership between the corporation and the alter ego defendant that their separate personalities no longer exist; and (2) the facts are such that

if the privilege of separate existence is recognized, meaning if the acts are treated separately as on behalf of one corporation alone, an inequitable result will follow.  *United States Fire Ins. Co. v. Nat'l Union Fire Insurance Co.*, 107 Cal. App. 3rd 456, 469 (1980).

79.  Courts may consider the following in determining whether to apply alter-ego liability: (1) the commingling of funds and assets of the two entities, (2) identical ownership in the two entities, (3) use of the same offices and employees, (4) disregard of corporate formalities, (5) identical directors and officers, and (6) use of one as a mere shell or conduit for the affairs of the other.  *Toho-Towa Co., Ltd. v. Morgan Creek Prods., Inc.*, 217 Cal. App. 4th 1096, 1108 (2013).  No one characteristic governs, but courts must look at all of the circumstances to determine whether they apply.  *Id.*

80.  There is no evidence of commingling of funds and assets between the two corporations.

81.  The ownership of V2H and V2 Tobacco is the same, and they both use the same offices. (Findings of Fact 6.)

82.  Mark Vogel and Patrick Vogel are the only employees of V2H. (Findings of Fact 8.)

83.  There is no evidence of a disregard of corporate formalities, but the two corporations do have the identical directors and officers.  (Findings of Fact 7.)

84.  There is no evidence that one of the corporations is used as a mere shell or conduit for the affairs of the other.

85.  There is no evidence in the record as to why Defendants chose to create and incorporate V2 Tobacco in 2011 as a wholly owned subsidiary of V2H.

86.  There is insufficient evidence to support VMR's alter ego theory of liability.

**V2 Parties' Affirmative Defense 5: Laches**

87.  A defendant asserting a laches defense must prove both of the following: (1) that the plaintiff's delay in filing suit was unreasonable, and (2) that the

defendant will suffer prejudice from the delay. *Internet Specialties West, Inc. v. Milon-DiGiorgio Enterprises, Inc.*, 559 F.3d 985, 990 (9th Cir. 2009).

88. There is no evidence to support a finding of any prejudice from a delay in filing suit.

**V2 Parties' Affirmative Defense 6: Acquiescence**

89. The affirmative defense of acquiescence includes the elements of laches – (1) plaintiff's unreasonable and inexcusable delay and (2) prejudice – as well as (3) affirmative conduct inducing the belief that it has abandoned its claim against the alleged infringer, and (4) detrimental reliance by the infringer. *See Seller Agency Council, Inc. v. Kennedy Ctr. For Real Estate Educ., Inc.*, 621 F.3d 981, 989 (9th Cir. 2010); *E & J Gallo Winery v. Pasatiempos Gallo, S.A.*, 905 F. Supp. 1403, 1414 (E.D. Cal. 1994) (citing *A.C. Aukerman Co. v. Miller Formless Co.*, 693 F.2d 697, 701 (7th Cir. 1982)).

90. There is no evidence to support a finding of any prejudice from a delay in filing suit, nor any evidence in the record that VMR affirmatively induced the V2 parties to believe that VMR abandoned any claims against them.

**V2 Parties' Affirmative Defense 7: Waiver**

91. Waiver is the intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish it. *United States v. King Features Entertainment, Inc.*, 843 F.2d 394, 399 (9th Cir. 1988).

92. There is no evidence of any intentional relinquishment of VMR's trademark rights in the V2 mark.

**V2 Parties' Affirmative Defense 8: Estoppel**

93. To prevail on an equitable estoppel defense, a defendant must prove (1) plaintiff knew of the infringing conduct; (2) plaintiff's actions or lack thereof led defendant to reasonably believe that plaintiff did not intend to enforce its trademark against defendant; (3) defendant did not know that plaintiff actually objected to defendant's conduct; and (4) due to its reliance on plaintiff's

actions, defendant would be materially prejudiced if plaintiff were allowed to proceed with its claim. *Id.* "Where anyone of the elements of equitable estoppel is absent, the claim must fail." *Am. Casualty Co. v. Baker*, 22 F.3d 880, 892 (9th Cir. 1994).

94. There is no evidence in the record that the V2 Parties relied on VMR's conduct, or that they were unaware that VMR would attempt to enforce its rights to the V2 mark.

**V2 Parties' Affirmative Defense 16: Unclean Hands**

95. Unclean hands is an equitable doctrine that "bars relief to a plaintiff who has violated conscience, good faith or other equitable principles in his prior conduct, as well as to a plaintiff who has dirtied his hands in acquiring the right presently asserted. *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 173 (9th Cir. 1989) To prevail on a defense of unclean hands, a defendant must demonstrate (1) that the plaintiff's conduct is inequitable, and (2) that the conduct relates to the subject matter of plaintiff's claims. *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987).

96. There is no evidence that VMR's conduct was inequitable with respect to its right to the mark V2 in the United States.

## V.    V2 PARTIES' COUNTERCLAIMS

1. The V2 Parties' seek an order cancelling VMR's V2CIGS trademark registration pursuant to 15 U.S.C. §§ 1119, 1120, and 1064(3).

**15 U.S.C. § 1119**

2. 15 U.S.C. § 1119 of the Lanham Act provides:

"… in any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action." 15 U.S.C. § 1119; *see also Airs Aromatics, LLC v.*

30

*Opinion Victoria's Secret Stores Brand Management, Inc.*, 744 F.3d 595, 598 (9th Cir. 2014).

3. A counterclaim requesting cancellation under 15 U.S.C. § 1119 does not, on its own, provide an independent basis for federal subject-matter jurisdiction. *Airs Aromatics*, 744 F.3d at 598. Rather, "Section 37 of the Lanham Act, 15 U.S.C. § 1119, permits district courts to resolve … subsidiary registration disputes when joined with an infringement claim." *Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n*, 465 F.3d 1102, 1111 (9th Cir. 2006).

**15 U.S.C. § 1064(3)**

4. 15 U.S.C. § 1064(3) of the Lanham Act provides the standard for the cancellation of a trademark registration based on a false or fraudulent trademark registration. The section states that a petition may be filed "at any time if the registered mark becomes the generic name for the goods or services, or a portion thereof, for which it is registered, or is functional, or has been abandoned, or its registration was ***obtained fraudulently***." 15 U.S.C. 1064 (emphasis added).

5. A party seeking cancellation of a trademark based on a false or fraudulent trademark registration must prove "(1) a false representation regarding a material fact; (2) the registrant's knowledge or belief that the representation is false; (3) the registrant's intent to induce reliance upon the misrepresentation; (4) actual, reasonable reliance on the misrepresentation; and (5) damages proximately caused by that reliance." *Robi v. Five Platters, Inc.,* 918 F.2d 1439, 1444 (9th Cir. 1990). The party seeking cancellation bears a heavy burden to cancel a trademark registration because, even if one factor is satisfied, all five factors must be met to succeed on the cancellation claim based on fraud. *See Hokto Kinoko Co. v. Concord Farms, Inc.*, 738 F.3d 1085, 1097 (9th Cir. 2013) (even if the court finds a bona fide intention to

make a false representation, cancellation is not warranted without evidence to support all of the remaining four factors). These claims have "uniformly been rejected" because applicants for registration need only show that they had a "good faith" belief that they were the senior user of the mark. *eCash Techs., Inc. v. Guagliardo*, 210 F.Supp.2d 1138, 1149 (C.D. Cal. 2001).

**15 U.S.C. § 1120**

6. Should a party prove that cancellation of a trademark based on false or fraudulent registration is warranted, 15 U.S.C. § 1120 of the Lanham Act provides that the party who fraudulently procures registration "shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof."

7. "Section 1120 counterclaims must arise from and at the time of registration rather than later use." *Aureflam Corp. v. Pho Hoa Phat I, Inc.*, 375 F.Supp.2d 950 (N.D. Cal. 2005) (citing *Gilbert/Robinson, Inc. v. Carrie Beverage–Missouri, Inc.*, 989 F.2d 985, 990 (8th Cir. 1993)).

8. In pleading fraud in a counterclaim for damages under Section 1120, a party must fulfill the heightened pleading requirements of Fed. R. Civ. Pro. 9(b) and must meet all five elements of fraud listed above. *Id.*

**V2 Parties' Counterclaim**

9. Before VMR performed any tests on its e-liquids to determine whether they contain tobacco, VMR represented to the USPTO that its products did not contain tobacco. (Findings of Fact 63.) However, there is no evidence in the record that this representation was made in bad faith; rather, VMR claims that it relied on information provided by its manufacturer, which stated that there was no tobacco in the product. (*Id.*)

10. There is no evidence to support false or fraudulent trademark registration. Therefore, the Court **DENIES** the V2 Parties' request to cancel the registration.

32

## VI.   PARTIES' MOTIONS FOR JUDGMENT AS A MATTER OF LAW

Both parties made oral motions for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50. (Tr. 556:8-559:14.) Because Rule 50 is only applicable to jury trials, the Court considers whether judgment should be entered under Rule 52(c).  Pursuant to Rule 52(c), if a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. Fed. R. Civ. P. 52(c).

**V2 Parties Motions for Judgment**

The V2 Parties argued at trial that they are entitled to judgment as a matter of law for four separate reasons: (1) Plaintiff failed to establish ownership and validity of the V2 mark; (2) Plaintiff failed to establish that a likelihood of confusion exists between the V2 and V2TOBACCO marks; (3) Plaintiff failed to establish alter-ego liability; and (4) Plaintiff failed to establish liability with regard to Defendant V2H.  The Court finds that the V2 Parties are entitled to judgment as a matter of law on VMR's infringement claim because there is no likelihood of confusion between the V2 and the V2TOBACCO marks. (*See* Conclusions of Law 72.) Therefore, the Court **GRANTS** the V2 Parties' motion for judgment as a matter of law.

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

33

**VMR's Motion for Judgment**

Plaintiff VMR argued at trial that it is entitled to judgment as a matter of law as to Defendant V2's counterclaims. The Court finds no evidence to support cancellation of Plaintiff's trademark based on false or fraudulent trademark registration. (*See* V2 Parties' Counterclaims 9, 10.) Therefore, the Court **GRANTS** VMR's motion for judgment as a matter of law as to Defendant V2's counterclaims.

DATED: December 29, 2016

_____

CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE